IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOYCE J. OVERTON                                                      PLAINTIFF

v.                Civil No. 04-2247

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Joyce J. Overton brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act and her application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

**Procedural Background:**

On February 5, 2002, Overton filed applications for DIB and SSI benefits. (Tr. 15, 62-63, 189-191). Overton alleged a disability onset day of January 11, 2002, due to arthritis. (Tr. 62, 68). An administrative hearing was held on September 10, 2003 (Tr. 203-220). Overton appeared and testified. (Tr. 207-217). Jim Spragins, a vocational expert, was also present. However, he was not called to testify. Overton was represented by counsel. (Tr. 203).

By written decision dated July 27, 2004, the administrative law judge (ALJ) found Overton not disabled within the meaning of the Social Security Act. (Tr. 15-22). He concluded she had an impairment or combinations of impairments that were severe including disorder of the back, mood disorder, pain in the head, neck, shoulder and wrists, legs, back and feet,

-1-

depression, fatigue, shaky inside and sleeplessness. (Tr. 19). However, after reviewing all of the evidence presented, he determined that plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation 4. (Tr. 19).

The ALJ found Overton had the residual functional capacity (RFC) to engage in light work, *i.e.*, lift and/or carry 20 pounds occasionally, stand, sit, and walk up to six hours of an eight-hour workday and sit up to six hours of an eight-hour workday with normal breaks. (Tr. 20). He found she could do a full range of light work with only occasional overhead reaching. (Tr. 20).

Plaintiff appealed the decision of the ALJ to the Appeals Council. (Tr. 8). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Overton's request for review. (Tr. 3-5). When it rendered its decision, the Appeals Council had before it additional evidence in the form a medical source statement of ability to do work-related activities (physical) signed by Robert Bishop M.D. (Tr. 6).

**Evidence Presented:**

At the hearing before the ALJ, Overton testified she was fifty-two years old and had a high school diploma. (Tr. 208). She last worked at the Ozark Nursing Home in January of 2002 as a nurses aide. (Tr. 208-209). While working there, she hurt her right arm and ended up with it in a sling. (Tr. 209). She is right handed. (Tr. 209). She was told that for someone in her condition there was no job in the nursing home she could do. (Tr. 209). The job required her to lift patients on a regular basis. (Tr. 210).

AO72A
(Rev. 8/82)

Overton also indicated she had worked as a cashier or clerk in stores, in poultry plants, and in kitchens. (Tr. 210). Each position involved regular lifting and/or moving of heavy objects. (Tr. 210-212).

Overton testified she can only lift her left arm over her head. (Tr. 212). She cannot lift her right arm over her head. (Tr. 212). She also understands that the problem with her neck and shoulder is caused by some cracks on the vertebrae in the back of her neck. (Tr. 212). Both Dr. Westerbrook and Dr. Richter have told her this will not get better and will get worse as she ages. (Tr. 213).

Overton indicated she has also been treated for arthritis. (Tr. 213). She stated Dr. Richter told her not to lift over eight pounds. (Tr. 213). Since she was told that, she only lifts heavier items with her left hand. (Tr. 213). Effectively, Overton testified she is limited to one arm. (Tr. 213).

Overton indicated she cannot lift a gallon of milk with her right arm. (Tr. 214). She can, however, lift a gallon of milk with her left arm. (Tr. 214). She does have some use of her right hand but nothing that takes any pressure to do such as cutting meat. (Tr. 215).

Since her injury, Overton testified she can no longer do yard work. (Tr. 214). She also indicated she sometimes needs help with meal preparation such as cleaning vegetables and cutting meat. (Tr. 214). The rest of the household chores she can pretty much take care of herself. (Tr. 214).

Overton testified her neck, arm, and shoulder ache and burn all the time. (Tr. 215). While this lets up sometimes, she stated it never goes away completely. (Tr. 215).

AO72A
(Rev. 8/82)

Overton has not been able to take anti-inflammatory medication because they upset her stomach and actually cause the pain to worsen. (Tr. 215). She indicates she has been told she is allergic to anti-inflammatory medication. (Tr. 215). She is also allergic to many types of painkillers. (Tr. 215).

To alleviate her pain, she has been told not to lift anything and not to move around a lot. (Tr. 216). She has also been told to take Tylenol and put heat on it. (Tr. 216). When she was given injections in her shoulder and elbow, they helped for two weeks at the most. (Tr. 216).

The record contains the following medical and vocational evidence. On January 30, 2002, Overton filled out a disability supplemental interview outline. (Tr. 86-90). She listed her weight as 180 and her height as 5' 4". (Tr. 86). She indicated she could bathe and dress herself and take care of her own hair care needs. (Tr. 86). She also indicated she could do dishes, change sheets, and vacuum/sweep. (Tr. 86). She stated she could not do laundry, take out the trash, do home repairs, wash the car, mow the lawn, rake leaves, or do garden work because she couldn't lift very much weight and couldn't stand to use her muscles much. (Tr. 86).

She stated she could shop for groceries, do the banking, and go to the post office. (Tr. 86). She stated she prepared meals fourteen times a week including sandwiches, frozen dinners, and desserts. (Tr. 87). She indicated it took her an hour to prepare a meal and took longer since her disability began. (Tr. 87).

She indicated she could pay bills, use a check book, and count change. (Tr. 87). She stated she could drive but not unfamiliar routes. (Tr. 87). She added that she got lost easily and mainly drives using her left hand. (Tr. 87). She stated she could not turn her head very far and could not drive long distances due to muscle cramps. (Tr. 87).

-4-

She stated she did not walk for exercise or errands. (Tr. 87). Despite being asked to do so, she did not explain her "no" answer. (Tr. 87).

She did not use any assistive devices. (Tr. 87). She spends her time watching TV, listening to the radio, and reading. (Tr. 87). She stated she could no longer do her job to her employer's satisfaction. (Tr. 87).

She indicated she suffered from unusual fatigue and had to rest twice or more a day for an hour or more. (Tr. 88). She described her pain as "sometimes burning stabbing pain, always a dull pain. Headaches almost every night. Bad leg cramps." (Tr. 88). She stated the pain was located in her neck, shoulder, wrists, legs, back, and feet. (Tr. 88). She indicated she was always in pain. (Tr. 88).

She stated the pain was caused by lifting, walking, sitting very long, and bending. (Tr. 88). She stated standing or walking caused the pain to immediately occur. (Tr. 88). She indicated she could sit for twenty to thirty minutes before the pain occurred. (Tr. 88). She indicated nothing helped the pain except medication. (Tr. 88).

Since her disability began, Overton indicated she was temperamental and got depressed easily. (Tr. 89). On an average day she stated she did some housework but was slower and tired more easily. (Tr. 89).

On August 10, 2000, Overton was seen at the Cornerstone Family Clinic. (Tr. 138-141). She was complaining of right arm, right shoulder, and neck pain. (Tr. 140).

Records indicate Overton went to the Western Arkansas Counseling and Guidance Center from January through May of 2001 where she was seen by Lynn Washington, a licensed professional counselor, and Dr. Martin Jansen, a staff psychiatrist. (Tr. 109-113). She reported

-5-

having "long-term problems with tension, primarily in neck, shoulders and upper back, but also affecting her heart rate at times." She was prescribed Zoloft 50 mg. one each morning and underwent relaxation training. (Tr. 113 & 111). She reported the medication was reasonably effective and she was having no difficulty with any side effects. (Tr. 113).

Overton was seen at the emergency room at Mercy Hospital Turner Memorial on January 11, 2002. (Tr. 120-121). She reported hurting her right arm from the shoulder to the hand while lifting a patient at the Ozark Nursing Home where she worked. (Tr. 121). She reported that Ibuprofen made her pain 100 times worse. (Tr. 121). She was diagnosed as having strained the muscles in her back and arm. (Tr. 121). She was advised to rest for two or three days and to see her family physician for a follow-up. (Tr. 121).

Records indicate she was treated by Dr. David Richter at Ozarks Medical Arts from September of 2001 until June of 2002. (Tr. 114-119, 122-129). She was seen on the following dates for the following reasons: September 6, 2001, complaining of a bad headache, not being able to sleep, being shaky since the headache started, and arthritis in the neck–diagnosed as having a muscle tension headache and prescribed Atarax and Tylenol #3 (Tr. 128-129); September 17, 2001, complaining of headaches, not sleeping at night, muscles swollen in her lower back, lower back pain and muscle spasms–prescribed Elocon for hand dermatitis, Propranolol, and Flexeril (Tr. 126-127); October 2, 2001, complaining of a headache, being nervous, right arm hurting, and stomach cramping–prescribed Ativan and Zoloft (Tr. 124-125); December 3, 2001, complaining of headache, cough, sore throat, and aches–prescribed a decongestant, antibiotic, and Tylenol (Tr. 122-123); January 14, 2002, complaining of right shoulder pain (Tr. 118-119); May 30, 2002, complaining of a stiff neck (muscle in back of her

-6-

head) and a spot on her upper lip that was not going away–prescribed Cutivate (Tr. 116-117); and June 20, 2002, complaining of chest wall pain–prescribed Tylenol #3 (Tr. 114-115).

On July 18, 2002, Overton underwent a consultative physical examination at the request of the Social Security Administration. (Tr. 130-137). The physician noted Overton's ears, throat, neck, heart, abdomen, and lungs were within normal limits. (Tr. 132-133). She had a slight range of motion in her left shoulder and a normal range of motion in her cervical spine, lumbar spine, right shoulder, elbows, wrists, hands, hips, knees, and ankles, with no abnormalities, deformities or instability. (Tr. 133-134).

It was noted she had degenerative joint disease. (Tr. 136). It was noted Overton was able to sit but was unable to walk or stand for any length of time and had limited use of her hands. (Tr. 137).

On August 20, 2002, an x-ray of her left shoulder showed "degenerative changes of the left acromioclavicular joint with joint space narrowing, sclerosing and small osterophyte formation." (Tr. 142). The diagnostic impression is listed as: "No acute osseous abnormality identified involving the left shoulder." (Tr. 142). An x-ray of her cervical spine showed mild disc degenerative change at C5-6. (Tr. 143).

On September 9, 2002, Overton underwent a mental status evaluation by Dr. Nancy J. Toombs at the request of the Social Security Administration. (Tr. 144-147). The diagnostic impression was: dysthymic disorder; dependent features; and arthritis. (Tr. 146). It was noted Overton had no difficulty with speech or language and could communicate her needs. (Tr. 146). No difficulties were observed in the area of physical development or concentration, persistence, and pace. (Tr. 147). Note was made that Overton could see to all of her activities of daily living.

(Tr. 147). While she lacked the funds to go to a laundromat, Overton and her son washed their clothes in the bathtub and hung them outside. (Tr. 147). Dr. Toombs stated Overton had no limitations in adaptive functioning. (Tr. 147). Dr. Toombs saw no evidence of exaggeration or malingering. (Tr. 147).

On September 17, 2002, a physical residual functional capacity assessment was completed by Dr. Jerry L. Thomas, a medical consultant. (Tr. 148-155). With respect to exertional limitations, it stated Overton could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was limited in the upper extremities (restricted over hand use of both left and right arms). (Tr. 149). No postural, visual, communicative, or environmental limitations were established. (Tr. 150-152). The only manipulative limitation established was that her over head reaching was to be occasional only. (Tr. 151). It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 153).

On September 24, 2002, a mental residual functional capacity assessment was completed by Dr. Daniel Donahue. (Tr. 156-159). Overton was noted to be moderately limited in the following categories: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public. (Tr. 156-158). There were no areas Overton was markedly limited in. Dr. Donahue

concluded Overton was able to "perform work where interpersonal contact is incidental to work performed, e.g., assembly work, complexity of tasks is learned and performed by rote, few variable, little judgment: supervision required is simple, direct and concrete." (Tr. 158).

A psychiatric review technique form was completed. (Tr. 160-173). It was concluded that Overton had an affective disorder and personality disorder. (Tr. 160). With respect to functional limitations, it was concluding these disorders would result in a moderate restriction of her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 170).

In November and December of 2002, Overton was seen by Dr. Michael Westbrook. (Tr. 174-179). Dr. Westbrook's diagnostic assessment was: osteroarthritis; menopausal; and depression. (Tr. 179).

On September 25, 2002, Earlene McDonald, a vocational analyst, concluded Overton retained the capacity to perform a wide range of light work. (Tr. 101).

On April 23, 2004, Dr. Robert M. Bishop completed a medical source statement regarding Overton's ability to do work-related activities (physical). (Tr. 9-11). Dr. Bishop listed Overton's diagnosis as: generalized arthritis, diabetes, HTN (hypertension), and depression. (Tr. 9). Dr. Bishop indicated Overton could sit continuously before alternating postures, standing, or walking about for a maximum of thirty minutes. (Tr. 9). He stated the total cumulative time she could sit during an eight hour work day was six hours. (Tr. 9).

With respect to standing, Dr. Bishop indicated Overton could stand continuously before alternating postures, sitting, or lying down for a maximum of thirty minutes. (Tr. 9). He stated the total cumulative time she could stand during an eight hour work day was four hours. (Tr. 9).

With respect to walking, Dr. Bishop indicated Overton could walk continuously before alternating postures, sitting, or lying down for a maximum of fifteen minutes. (Tr. 9). He stated the total cumulative time she could stand during an eight hour work day was four hours. (Tr. 9). He stated the total amount of combined walking and standing she could do in an eight hour day was four hours. (Tr. 9).

He stated she could: never lift or carry 21-50 pounds; occasionally lift or carry 6-10 pounds and 11-20 pounds; could frequently lift 1-5 pounds; and could occasionally carry 1-5 pounds. (Tr. 10). He indicated these limitations were supported by painful limited active range of motion in Overton's shoulders, neck, and back. (Tr. 10).

Dr. Bishop indicated no limitations on Overton's use of her hands or feet for repetitive action or motions. (Tr. 10). He stated she could not bend, squat, crawl, climb, stoop, crouch, or kneel, and could only occasionally reach above her head. (Tr. 10).

Dr. Bishop stated Overton could not tolerate exposure to unprotected heights and could only occasionally tolerate being around moving machinery and driving automotive equipment. (Tr. 10). He indicated she could frequently tolerate exposure to marked temperature changes, exposure to dust, fumes & gases, and exposure to noises. (Tr. 10).

During his examination of her on April 23, 2004, he detected no objective signs of pain. (Tr. 11). He indicated her pain was slight and could be tolerated but would cause some handicap in the performance of activity precipitating the pain. (Tr. 11).

Dr. Bishop indicated Overton would sometimes need to take unscheduled breaks and would have good days and bad days. (Tr. 11). He estimated she would be likely to be absent from work about two days per month as a result of the impairments or treatment. (Tr. 11). In

AO72A
(Rev. 8/82)

the remarks section of the form, Dr. Bishop wrote: "Patient mild orthopedic or rheumatologic disabilities from mild degenerative joint disease of shoulders, cervical spine and lumbar spine." (Tr. 11).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

In this case, we believe remand is necessary for a number of reasons. First, we believe the ALJ failed to properly evaluate Overton's mental impairment. As the Eighth Circuit has noted, "[t]he evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment." *Vester v. Barnhart*, 416 F.3d 886, 892-893 (8th Cir. 2005). The ALJ found Overton suffered from severe mental impairments, *i.e.,* depression and mood disorder. (Tr. 19). However, he found no nonexertional impairments to exist. (Tr. 20).

Although the ALJ discussed the examination done by Dr. Toombs, the ALJ merely cited to, without discussion, the residual mental functional capacity assessment and the psychiatric

-12-

review technique form both completed on September 24, 2002. (Tr. 156-159, 160-177). The RFC assessment indicated Overton had moderate limitations in the ability to understand and remember detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 156-157). Additionally she had a moderate limitation in her ability to interact appropriately with the general public. (Tr. 157).

The psychiatric review technique form indicated that Overton had an affective disorder (12.04 disturbance of mood accompanied by depressive syndrome), (Tr. 163), and a personality disorder (12.08) (Tr. 167). Overton was determined to have inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress as evidenced by pathological dependence, passivity, or aggressivity. (Tr. 167). It was noted she would have moderate restrictions of the activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 170).

While the ALJ may have sound reasons for discounting the opinions of the Social Security Administration's psychologist, Dr. Daniel Donahue, there is no indication in the record what these reasons may have been. Instead, the ALJ merely listed Overton's severe impairments and then virtually without discussion concluded she had no nonexertional impairments.

Second, we find the ALJ failed to properly evaluate Overton's subjective complaints of pain. In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that

of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, the ALJ's decision recited the relevant factors that must be considered in evaluating a claimant's allegations of disabling pain. He found Overton's testimony to be generally credible and consistent with the medical records but found that it was not indicative of total disability. (Tr. 19). He further found the medical evidence was not supportive of the degree of restriction. (Tr. 19).

The ALJ then discounted Overton's assertion of constant pain and significant limitations without discussing her apparent inability to take many anti-inflammatory and pain killing medications because of allergies to the medication. He made no mention of any limitations the pain would have on her ability to perform job related functions. *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)(*citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). *See also Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004)("We have long stated that to determine whether claimant has the residual functional capacity necessary to be able to work we look to whether she has the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.")(internal quotation marks and citation omitted).

Upon remand, consideration should be given to whether it was appropriate to use the Medical-Vocational Guidelines. While there are circumstances in which an ALJ may use the Guidelines even though there are nonexertional impairments, *McGeorge v. Barnhart*, 321 F.3d 766, 768-769 (8th Cir. 2003)(*quoting Thompson v. Bowen*, 850 F.2d 346, 349-350 (8th Cir.

-14-

1988)),"when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001). *See also Gray v. Apfel*, 192 F.3d 799, 802 (8th Cir. 1999).

Finally, we note that the record before the court is incomplete. Certain pages are missing from the transcript. The transcript goes from page 180 to 188. Among other things, within those missing pages is a note dated September 10, 2003, from Dr. Richter which is discussed by the ALJ. (Tr. 19).

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be reversed and the case remanded to the Commissioner. A separate judgment in accordance with this opinion will be entered.

Dated this 7th day of November 2005.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)